**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

VICTORIA DAWKINS,
*on behalf of herself and all others similarly situated,*

Plaintiff, Case No. _____________

v.

CARRINGTON MORTGAGE SERVICES, LLC,

Defendant.
____________________________________/

**CLASS ACTION COMPLAINT**

1. Plaintiff VICTORIA DAWKINS, on behalf of herself and all others similarly situated, alleges breach of contract, unjust enrichment, and violations of the Florida Consumer Collection Practices Act, FLA. STAT. § 559.72 ("FCCPA"), the Florida Deceptive and Unfair Trade Practices Act FLA. STAT. § 501.203 ("FDUTPA"), against Defendant CARRINGTON MORTGAGE SERVICES, LLC ("Carrington").

2. Carrington, one of the largest servicers of residential mortgages in the country, routinely violates Florida debt collection law, and breaches the uniform terms of borrowers' mortgages ("Uniform Mortgages") by charging and collecting illegal processing fees when borrowers pay their monthly mortgage by phone or online ("Pay-to-Pay Fees"). Carrington illegally charges homeowners $5.00 for each online payment, and either $10.00 or $20.00 for payments made over the phone ("Pay-to-Pay Transactions").

3. Carrington services mortgages throughout the United States and is supposed to be compensated out of the interest paid on each borrower's monthly payment. Carrington may charge

borrowers fees actually authorized by the Uniform Mortgage or amounts actually paid to third parties who perform services for Carrington's borrowers. But Carrington cannot mark-up the amounts it pays third parties to provide borrowers' services and impose unauthorized charges to create a profit center for itself. Here, Carrington charged borrowers for online Pay-to-Pay Fees through Quick Pay, an automated online and telephone payment processing system created and maintained by Western Union. For performing this work, Carrington pays Western Union about $0.50 or less per online Pay-to-Pay Transaction and pockets the difference ($4.50) for itself as profit. Upon information and belief, Carrington also charges more for telephone Pay-to-Pay Fees than it spends to process the telephone Pay-to-Pay Transactions, pocketing for itself the difference ($9.50 or $19.50 per telephone transaction).

4.     The Federal Housing Administration ("FHA") requires all loan servicers, including Carrington, to be approved by the FHA before servicing any loans.  Loan servicers, like Carrington, are paid loan servicing fees out of the interest paid by FHA borrowers.  In exchange for the regular loan servicing fees paid by from borrowers' monthly interest payments, Carrington and other FHA approved loan servicers agree to follow the FHA's rules regarding loan servicing, as implemented by the Secretary of Housing and Urban Development ("HUD").

5.     In addition, FHA-approved loan servicers, like Carrington, may collect additional revenue for additional work performed for the borrower. But the uniform FHA mortgage agreement explicitly limits additional fees only to those specific fees authorized by the Secretary of HUD.  **Exhibit A**, ¶ 8.

6.     Despite its uniform contractual obligations to charge only fees explicitly allowed under the Uniform Mortgages and applicable law, and for FHA mortgages, only those fees approved by the HUD Secretary, Carrington leverages its position of power over homeowners and

demand exorbitant Pay-to-Pay Fees. Even if some fee were allowed, the mortgage uniform covenants and applicable law only allow Carrington to pass along the actual costs of fees incurred to it by the borrowers—here, only a few cents per transaction.

7. Plaintiff paid these Pay-to-Pay Fees and brings this class action lawsuit individually and on behalf of all similarly situated putative class members, to recover the unlawfully charged Pay-to-Pay Fees and to enjoin Carrington from continuing to charge these unlawful fees.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S. Code § 1332(d), because diversity exists between Carrington and at least one class member and the matter in controversy exceeds $5,000,000.

9. This Court has personal jurisdiction because Carrington transacts business in Florida and commits torts in Florida, as described in this Complaint.

10. Venue is proper because a substantial portion of the events alleged herein occurred within this District.

**PARTIES**

11. Plaintiff Victoria Dawkins ("Plaintiff" or "Ms. Dawkins") is a natural person residing at Margate, Broward County, Florida, who has an FHA-insured mortgage loan serviced by Carrington. Ms. Dawkins sometimes makes loan payments online, and each time she does so, Carrington charges her a Pay-to-Pay Fee. For example, and as detailed below, on February 20, 2020, Carrington charged Ms. Dawkins a $5.00 Pay-to-Pay Fee for making payments online.

12. Defendant Carrington is a Delaware limited liability corporation with a principal office in Anaheim, California.

**APPLICABLE LAW AND SERVICING RULES**

13. The Florida Supreme Court liberally construes public protection statutes in favor of the public. *Samara Dev. Corp. v. Marlow*, 556 So. 2d 1097, 1100 (Fla. 1990).

***FCCPA***

14. The FCCPA prohibits debt collectors from engaging in certain abusive practices in the collection of consumer debts. *See generally* Fla. Stat. § 559.72.

15. The FCCPA's goal is to "provide the consumer with the most protection possible." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing Fla. Stat. § 559.552).

16. Specifically, the FCCPA states that no person shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." Fla. Stat. § 559.72(9).

17. To define the legal rights between parties, courts "must refer to other statutes that establish the legitimacy of a debt and define legal rights." *Cliff v. Payco Gen. American Credits, Inc.*, 363 F.3d 1113, 1126 (11th Cir. 2004) ("With respect to determining what constitutes a misrepresentation of a legal right under Section 559.72(9), the Court "must refer to other statutes that establish the legitimacy of a debt and define legal rights."); *Brook v. Suncoast Sch., FCU*, 8:12-CV-01428-T-33, 2012 WL 6059199, at *3 (M.D. Fla. Dec. 6, 2012) (finding FCCPA violated when defendant asserted illegitimate legal right by attempting to collect a debt using unfair and deceptive practices in violation of FDUTPA.); *Ortega v. Collectors Training Inst. of Illinois, Inc.*, 09-21744-CIV, 2010 WL 11505559, at *5 (S.D. Fla. Mar. 31, 2010) (finding FCCPA violated when defendant used debt collection techniques prohibited by the Fair Debt Collection Practices Act.)

18.     The FCCPA creates a private right of action under Fla. Stat. § 559.77.

19.     The FCCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." *Id.* § 559.55(8).

20.     The FCCPA mandates that "no person" shall engage in certain practices in collecting consumer debt. *Id.* § 559.72. This language includes all allegedly unlawful attempts at collecting consumer claims. *Williams v. Streeps Music Co.*, 333 So. 2d 65, 67 (Fla. Dist. Ct. App. 1976).

21.     The FCCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *Id.* § 559.55(6).

***FDUTPA***

22.     The FDUTPA is "construed liberally to promote" the protection of consumers and businesses from "unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

23.     The FDUTPA creates a private right of action for FDUTPA violations. *Id.* § 501.211.

24.     The FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce" against consumers. *Id.* § 501.204(1).

25.     The FDUTPA defines "consumer" broadly as an individual, entity, or any group or combination. *Id.* § 501.203(7).

26. The FDUTPA defines "trade or commerce" as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Id.* § 501.203(8).

27. An act or practice is unfair when: (1) it is substantially injurious to consumers; (2) not outweighed by any countervailing benefits to consumers or competition; and (3) involves an injury that consumers themselves could not reasonably have avoided. *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1364 (11th Cir. 1988); *PNR, Inc v. Beacon Prop. Mgmt*, 842 So. 2d 773, 777 (Fla. 2003).

28. The Florida Supreme Court has noted that "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (quotation marks and citation omitted).

29. Where there is a violation of a statute prohibiting unfair or deceptive acts, a *per se* violation of Florida's FDUTPA has also occurred. *See* Fla. Stat. § 501.203(3) (stating a violation of any law proscribing unfair methods of competition, or unfair, deceptive, or unconscionable acts is also a violation the FDUTPA); *Blair v. Wachovia Mortg. Corp.*, No. 11–cv–566–Oc–37TBS, 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012) ("[A] *per se* violation of FDUTPA stems from the transgression of any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.").

***FHA Servicing Rules***

30. The Federal Housing Administration, an agency within the United States Department of Housing and Urban Development, "provides mortgage insurance on loans made by

FHA-approved lenders throughout the United States and its territories."[1] The FHA "is the largest insurer of mortgages in the world, insuring over 47.5 million properties since its inception in 1934."[2]

31.     The FHA provides incentives to private lenders to make loans to would-be homebuyers whose creditworthiness and inability to contribute a significant down payment make it difficult for them to obtain a home loan on reasonable terms.

32.     To achieve that goal, "FHA mortgage insurance provides lenders with protection against losses as the result of homeowners defaulting on their mortgage loans. The lenders bear less risk because FHA will pay a claim to the lender in the event of a homeowner's default."[3]

33.     The FHA restricts who can make and service FHA loans. "Only FHA-approved Mortgagees may service FHA-insured Mortgages," and those "Mortgagees may service Mortgages they hold or that are held by other FHA-approved Mortgagees." (*Id.*)

34.     Carrington is an FHA-approved Mortgagee.

35.     As an FHA-approved Mortgagee, Carrington must annually "acknowledge that the Mortgagee is now, and was at all times throughout the Certification Period, subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964."[4]

---

[1] HUD.gov – The Federal Housing Administration,
https://www.hud.gov/program_offices/housing/fhahistory (last visited on May 19, 2020).
[2] *Id.*
[3] *Id.*
[4] *See*, FHA Lender Annual Certifications: Supervised and Nonsupervised Mortgagees, Changes Implemented 8/1/2016,

36. HUD's servicing requirements restrict the fees and charges an FHA-approved Mortgagee may collect from the typically lower-income FHA borrower. HUD Handbook 4000.1: *Single-Family Housing Policy*, https://www.hud.gov/sites/documents/40001HSGH.PDF (last accessed by counsel on May 19, 2020) (the "HUD Handbook").

37. HUD makes clear "[t]he Mortgagee must fully comply with all of the following standards and procedures when servicing a Mortgage insured by the Federal Housing Administration." *Id.*

38. These mandatory restrictions include limits on the types and amounts of fees and charges an FHA-approved Mortgagee may collect from a borrower.

39. FHA-insured mortgages contain uniform covenants.

40. In one such uniform covenant, the parties to the mortgage agree that "Lender may collect fees and charges ***authorized*** by the Secretary [of Housing and Urban Development]." **Ex. A** at ¶ 8 (emphasis added).

41. This provision incorporates by reference HUD's limits on allowable fees.

42. The HUD Handbook states that lenders:

> may collect certain reasonable and customary fees and charges from the Borrower after the Mortgage is insured and ***as authorized by HUD*** below. All fees ***must*** be:
>
> - reasonable and customary for the local jurisdiction;
> - based on the actual cost of the work performed or actual out-of-pocket expenses and not a percentage of either the face amount or the unpaid principal balance of the Mortgage; ***and***
> - within the maximum amount allowed by HUD.

---

https://www.hud.gov/sites/documents/SFH_COMP_SUPERNONSUPER.PDF (last visited on May 8, 2020) (emphasis added).

HUD Handbook at 617-618 (emphasis added). In other words, lenders may only collect fees that are authorized by HUD, and fees that are authorized by HUD are only those fees that meet all three of the specified criteria. Thus, for example, a fee that is within the maximum amount allowed by HUD but also generates a profit for the lender would not be allowed.

43.     To determine "the maximum amount allowed by HUD" for a fee, a lender must consult Appendix 3.0 of the HUD Handbook, which contains an exhaustive list of the servicing fees and charges authorized by HUD and the maximum amounts that may be charged for such fees.[5] Pay-to-Pay Fees are not on that list.

44.     The HUD Handbook further states "The Mortgagee must not charge the Borrower" for "costs of telephone calls, telegrams, personal visits with the Borrower, certified mail, or other activities that are normally considered a part of a prudent Mortgagee's servicing activity." HUD Handbook at 618.

45.     The HUD Handbook provides that a "Mortgagee may request approval from the National Servicing Center (NSC) for any fee, charge, or unusual service not specifically mentioned in this *SF Handbook.*" HUD Handbook at 618.

46.     Based upon information and belief, the Pay-to-Pay Fees that Carrington collects from borrowers exceed its out-of-pocket costs by several hundred percent, and thus violate mandatory HUD servicing rules that are incorporated into all FHA-insured mortgages. Moreover, because the Pay-to-Pay Fees are both a cost in connection with a telephone call, and not included on Appendix 3.0, they, are not authorized, even if they are based on actual cost of work and are reasonable and customary for the given geographic region.

---

[5] In the PDF version of the HUD Handbook, the term "maximum amount allowed by HUD" contains a hyperlink that, when clicked, brings the reader to Appendix 3.0.

## NAMED PLAINTIFF'S ALLEGATIONS

***The Mortgage-Servicer Industry***

47. Mortgage lenders rarely service their own loans. In many cases, lenders specialize in the origination of the loan, but they are not equipped to handle the day-to-day administrative tasks that come with a mortgage. Instead of managing these duties in-house, they assign the servicing rights of their loans to a designated servicer—a company that specializes in the actual management and administration of mortgages.

48. A mortgage servicer is a company that, in turn, handles the day-to-day administrative tasks of a mortgage loan, including receiving payments, sending monthly statements and managing escrow accounts.

49. Carrington is a mortgage-loan servicer that operates throughout the country.

50. Each time a mortgage borrower whose loan is serviced by Carrington makes a loan payment online or over the phone, Carrington charges the borrower a Pay-to-Pay Fee: $5.00 for each online payment, $10.00 for payments made over the phone via an automated system, and $20.00 for payments made over the phone with a customer service representative.

51. Carrington's online Pay-to-Pay Transactions, which incur a $5.00 fee, are processed by Western Union, through its Quick Pay system. The usual cost that a loan servicer pays Western Union to process Pay-to-Pay Transactions payments is $0.50 or less for each transaction. Therefore, the actual cost for Carrington to process online Pay-to-Pay Transactions is well below the amounts charged to borrowers, and Carrington illegally pockets the difference as profit. The actual cost for Carrington to process telephone Pay-to-Pay Transactions, which incur

$20.00 and $10.00 fees, is also well below the amounts charged to borrowers.

52. The mortgages of Ms. Dawkins and the purported classes that Carrington services are Uniform Mortgages; that is, they are FHA and/or Fannie Mae/Freddie Mac Uniform Instruments used when originating Single-Family residential mortgage loans.

53. The Uniform Mortgages of Carrington's customers do not authorize it to charge Pay-to-Pay Fees.

54. At most, the mortgage uniform covenants allow Carrington to pass along only the actual cost of fees incurred by it to the borrower.

55. Carrington violates the borrowers' Uniform Mortgages when it assesses such fees. Carrington frequently, intentionally, and persistently collects Pay-to-Pay Fees even though such fees are not authorized by the Uniform Mortgages and it therefore has no right to collect them.

***Ms. Dawkins' Mortgage Loan***

56. On or about June 24, 2010, Ms. Dawkins obtained a mortgage loan from New Penn Financial, LLC secured by her home in Margate, Broward County, Florida (the "Mortgage Agreement").

57. The Mortgage Agreement is attached as **Exhibit A**.

58. Ms. Dawkins obtained the mortgage loan secured by her property for personal, family or household uses.

59. After Ms. Dawkins closed on the loan in June 2010, Carrington acquired the loan and its servicing rights by way of an assignment.

***Carrington Collected Illegal Pay-to-Pay Fees from Plaintiff***

60. Ms. Dawkins occasionally make her mortgage payments online.

61. Each time she does so, Carrington charges her a Pay-to-Pay Fee.

62. For example, on February 20, 2020, Ms. Dawkins made a mortgage payment online and Carrington charged her a $5.00 Pay-to-Pay Fee for making that online payment.

63. Ms. Dawkins made timely mortgage payments and was never in default under the terms of the Mortgage Agreement.

64. These fees are not authorized by the Mortgage Agreement.

65. Carrington collects the Pay-to-Pay Fees even though such fees are not authorized under the Mortgage Agreement.

66. Carrington's principal purpose is to collect debt, and it regularly collect debts which are owed and due another.

67. Carrington collected the Pay-to-Pay Fees even though it knew that such fees were not authorized under the Mortgage Agreement, and that it therefore had no right to collect them.

68. Ms. Dawkins, like many borrowers, has an FHA mortgage, meaning that the mortgage is issued by an FHA-approved lender and insured by the FHA. The uniform covenants of the FHA mortgages state that the lender may only assess fees authorized by the Secretary of HUD.

69. Ms. Dawkins' Mortgage Agreement states that the mortgage "shall be governed by federal law and the law of the jurisdiction in which the Property is located," i.e., Florida law. *See* **Ex. A** ¶ 14.

70. HUD permits servicers of FHA mortgages to collect "allowable fees and charges," i.e., fees and charges specifically delineated in Appendix 3 to the HUD Handbook. *See* HUD Handbook 4000.1, FHA Single Family Housing Policy Handbook § III.A.1.f. Servicers seeking to assess fees "not specifically mentioned" in the Servicing Handbook must request approval from the National Servicing Center to charge such fees. *Id*. § III.A.1.f.(B). HUD prohibits servicers from

charging the borrower for "activities that are normally considered a part of a prudent Mortgagee's servicing activity. *Id*. § III.A.1.f.(C).

71.    As set forth herein, the HUD Handbook does not authorize Pay-to-Pay Fees. Carrington has not sought authorization from the National Servicing Center to charge Pay-to-Pay Fees.

72.    Like other FHA mortgages, the Mortgage Agreement states that "Lender may collect fees and charges authorized by the Secretary." **Ex. A** ¶ 8.  By assessing Pay-to-Pay Fees not "authorized by the Secretary," Carrington violated the uniform covenants of the Mortgage Agreement.

73.    Because the above provisions are contained in the "Uniform Covenants" section of the Mortgage Agreement, Carrington has breached its contracts on a class-wide basis.

74.    Even if Carrington is allowed to collect a fee under the auspice that it is a default-related fee under Paragraph 7 of the Mortgage Agreement, Carrington's demand for payment of Pay-to-Pay Fees was a direct breach of that paragraph, too. Paragraph 7 states that only "amounts *disbursed* by Lender under this Paragraph shall become an additional debt of Borrower." **Ex. A** ¶ 7.  Carrington collected more than the amounts disbursed to process the Pay-to-Pay Transactions

75.    Carrington acted deceitfully by assessing Ms. Dawkins Pay-to-Pay Fees that it was not authorized to collect, and by charging them more in Pay-to-Pay Fees than it actually disbursed to process the Pay-to-Pay Transactions.

76.    Prior to filing this Complaint, Ms. Dawkins made a written pre-suit demand upon Carrington.

77.    Carrington was given a reasonable opportunity to cure the breaches complained of herein but failed to do so.

## CLASS REPRESENTATION ALLEGATIONS

78. Ms. Dawkins bring this action under Fed. R. Civ. P. 23 on behalf of the following classes of persons (collectively, "Classes"), subject to modification after discovery and case development:

> **Nationwide FHA Class:** All persons in the United States (1) with an FHA-insured residential mortgage loan (2) to which Carrington acquired servicing rights (3) who during the applicable statutes of limitations through the date a class is certified were charged one or more Pay-to-Pay Fee, and (4) whose mortgages provide that "Lender may collect fees or charges authorized by the Secretary," or language substantially similar. Excluded from this class are all class members in *Amy Thomas-Lawson, et al. v. Carrington Mortgage Services, LLC*, Case No. 1:19-cv-03567-DLB (D. Md.).

> **Florida Class**: All persons with a Florida address who were borrowers on residential mortgage loans to which Carrington acquired servicing rights, and paid a Pay-to-Pay Fee to Carrington for making a loan payment by telephone, IVR, or the internet, during the applicable statutes of limitations through the date a class is certified.

79. Excluded from the Classes are Carrington; any entities in which it has a controlling interest; its agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

80. Members of the Classes ("Class Members") are identifiable through Carrington's records and payment databases.

81. Ms. Dawkins proposes that she be appointed as class representatives.

82. Ms. Dawkins and the Classes have all been harmed by the actions of Carrington.

83. Numerosity is satisfied. Upon information and belief, there are thousands of Class Members. Individual joinder of these persons is impracticable.

84. There are questions of law and fact common to Ms. Dawkins and the Classes, including, but not limited to:

a.   Whether Carrington violated the FCCPA by charging Pay-to-Pay Fees not due;

b.   Whether Carrington violated the FDUTPA by charging Pay-to-Pay Fees not due;

c.   Whether Carrington breached its mortgage agreements with Class Members by charging Pay-to-Pay Fees not due;

d.   Whether Carrington's costs for the Pay-to-Pay Transactions are less than the amount it charged for Pay-to-Pay fees;

e.   Whether Ms. Dawkins and Class Members are entitled to injunctive relief;

f.   Whether Ms. Dawkins and Class Members are entitled to actual and/or statutory damages as a result of Carrington's actions; and

g.   Whether Ms. Dawkins and Class Members are entitled to attorney's fees and costs.

85.    Ms. Dawkins' claims are typical of the claims of class members.  Carrington charged Ms. Dawkins Pay-to-Pay Fees in the same manner as the Class Members.  Ms. Dawkins and the Class Members entered into uniform covenants in their Mortgage Agreements that prohibit Pay-to-Pay charges.  Alternatively, if Carrington is allowed under the Mortgage Agreements to charge Pay-to-Pay Fees, such amount is capped at the actual amounts disbursed by Carrington to process the Pay-to-Pay Transactions.

86.    Ms. Dawkins is an adequate representative of the Classes because her interests do not conflict with the interests of the Class Members and she will fairly and adequately protect the interests of the Classes.  Ms. Dawkins has taken actions before filing this Complaint, by hiring skilled and experienced counsel, and by making a pre-suit demand on behalf of Class Members to protect the interests of the class.

87.    Ms. Dawkins has hired counsel that is skilled and experienced in class actions and are adequate class counsel capable of protecting the interests of the class members.

88.     Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of this controversy.

89.     The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**COUNT I**
**VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT**
**Fla. Stat. § 559.72(9)**
**On Behalf of Ms. Dawkins and the Florida Class**

90.     Paragraphs 1 to 77 are hereby incorporated by reference.

91.     Ms. Dawkins was a "consumer" as defined by Fla. Stat. § 559.55(8) when she purchased her home by mortgage.

92.     Carrington is a "person" as stated in the FCCPA.

93.     Ms. Dawkins purchased her home by residential mortgage that was for personal, family or household use.

94.     Carrington attempted to enforce, claimed, and asserted a known non-existent legal right to a debt as defined by Fla. Stat. § 559.55(6) when Carrington charged, attempted to collect, and collected Pay-to-Pay Fees. *Id.* § 559.72(9).

95.     Carrington, as the loan servicer, must know the terms of Ms. Dawkins' Mortgage Agreement and that it may only collect fees allowed by federal or state law.

96.     Carrington, as a loan servicer, must maintain policies and procedures for the collection of fees and review the justification of those fees.

97.     Carrington knew its collection of Pay-to-Pay Fees was illegal because it knew the terms of the Mortgage Agreement did not allow the fee, it knew through its own policies that it

was collecting a fee not allowed by federal or state law, it knew the contract it has with a third party processor that the Pay-to-Pay fees it collected were being up-charged for profit, it knew that the collection of Pay-to-Pay fees were an illegal profit center but continued to maintain its policies to collect Pay-to-Pay fees, and it knew that it was collecting Pay-to-Pay fees illegally and not by mistake, because it collected them following its own policies, resulting in fees hundreds of thousands of Pay-to-Pay transactions from Florida borrowers.

98. Carrington's acts of illegally attempting to collect a debt from Ms. Dawkins and deliberately charging monthly Pay-to-Pay Fees constitutes a knowing violation of § 559.72(9) of the FCCPA.

99. Carrington also has no legal right to charge and collect a fee from Ms. Dawkins using unfair and deceptive conduct.

100. By omitting important financial information from borrowers like Ms. Dawkins about the profit being earned on each Pay-to-Pay Fee, Carrington used deceptive conduct while charging and collecting the Pay-to-Pay Fees.

101. By systematically breaching the borrowers' mortgage agreements, like Ms. Dawkins', Carrington used unfair conduct in charging and collecting the Pay-to-Pay Fees.

102. As a result of Carrington's FCCPA violations, Ms. Dawkins and members of the Florida Class suffered substantial damage, including but not limited to financial damage incurred from Carrington's illegal Pay-to-Pay Fees.

**COUNT II**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.203(3), 501.204**
**On Behalf of Ms. Dawkins and the Florida Class**

103. Paragraphs 1 to 77 are hereby incorporated by reference.

104.    Ms. Dawkins is a "consumer" as defined by Fla. Stat. § 501.203(7).

105.    Carrington engaged in "trade or commerce" as defined by § 501.203(8) when it attempted to collect, and collected, a debt associated with mortgage payments.

106.    Carrington violated § 559.72(9) of the FCCPA when it attempted to collect, and collected, a debt associated with mortgage payments.

107.    A violation of Fla. Stat. § 559.72(9) of the FCCPA is a per se violation of FDUTPA under Fla. Stat. § 501.203(3). A violation of the Fair Debt Collection Practices Act ("FDCPA") is also a per se violation of FDUTPA.

108.    In addition to the above-referenced per se FDUTPA violations, Carrington also generally violated FDUTPA under Fla. Stat. § 501.204(1) when it engaged in unfair and deceptive practices in trade or commerce by taking advantage of consumers in claiming and collecting debts for amounts not owed.

109.    Carrington also has no legal right to charge and collect a fee from Plaintiff using unfair and deceptive conduct.

110.    By omitting important financial information from borrowers like Ms. Dawkins about the profit being earned on each Pay-to-Pay Fee, Carrington used deceptive conduct while charging and collecting the Pay-to-Pay Fees.

111.    By systematically breaching the borrowers' mortgage agreements, like that of Ms. Dawkins, Carrington used unfair conduct in charging and collecting the Pay-to-Pay fees.

112.    Carrington never informed Ms. Dawkins when she made her payment that the Pay-to-Pay Fee was not allowed under her Mortgage Agreement and that the actual cost to Carrington for the Pay-to-Pay Fee was far less than the amount charged to Ms. Dawkins.

113. As a result of Carrington's FDUTPA violations, Ms. Dawkins and members of the Florida Class suffered substantial damage, including but not limited to financial damage incurred from Carrington's unlawful Pay-to-Pay Fees.

**COUNT III**
**BREACH OF CONTRACT**
**On Behalf of Ms. Dawkins and the Florida Class and the Nationwide FHA Class**

114. Paragraphs 1 to 77 are hereby incorporated by reference.

115. Ms. Dawkins and the Class Members are parties to contracts with Carrington. Carrington became bound as an assignee to the mortgages held by Ms. Dawkins and the Class Members when Carrington became the servicer of their mortgage loans. Carrington breached its contracts with Ms. Dawkins and the Class Members when it charged Pay-to-Pay Fees in violation of the Uniform Mortgages and in excess of the amounts actually disbursed by Carrington to pay for the cost of the Pay-to-Pay Transactions.

116. Carrington violated its mortgage agreements with Ms. Dawkins and Class Members as described herein, and thereby caused damage to Ms. Dawkins and Class Members.

117. Ms. Dawkins purchased a home subject to the Mortgage Agreement. *See* **Ex. A**. When Carrington accepted an assignment of such mortgage and became the servicer of the mortgage, it became a party to the Mortgage Agreement. Thus, Carrington became bound as an assignee by the Mortgage Agreement with Ms. Dawkins whereby money was lent to Ms. Dawkins to purchase property in exchange for certain payment over time. *See* **Ex. A ¶** 12.

118. Ms. Dawkins sometimes makes her mortgage payments online. When she does, Carrington charges her a Pay-to-Pay Fee. For example, Carrington charged Ms. Dawkins $5.00 to

pay her mortgage online, including on or about February 20, 2020. These fees were not authorized by the Mortgage Agreement.

119. Carrington's demand for payment of Pay-to-Pay Fees is a breach of the Mortgage Agreement, which does not delineate Pay-to-Pay Fees as one of the many charges that the lender, or loan servicer acting on behalf of the lender, may charge. There is simply no provision in the mortgage that allows Carrington to collect Pay-to-Pay Fees.

120. The Mortgage Agreement states that "[t]his Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located," i.e., Florida law. **Ex. A** ¶ 14.

121. Carrington's demand for payment of Pay-to-Pay Fees breached Paragraph 14 of the Mortgage Agreement because Federal debt-collection law prohibits the collection of any amount incidental to the principle obligation unless that amount is *expressly* stated in the loan agreement. *See* FDCPA, 15 U.S.C. § 1692f(1) (making unlawful the "collection of any amount (including any interest, fee, charge or expense incidental to the principal obligation) *unless such amount is expressly authorized by the agreement creating the debt or permitted by law*.") (emphasis added).

122. Federal courts in this Circuit have reached the same conclusion that the demand for processing fees are illegal where they are not expressly identified in the loan agreement, violating both federal and Florida debt collection law. *See e.g., Prescott v. Seterus, Inc.*, No. 15-10038, 2015 WL 7769235, at *2-6 (11th Cir. Dec. 3, 2015) (holding that charging certain fees not agreed to in the mortgage agreement violated the FCCPA and FDCPA); *Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 610 (11th Cir. 2014) (holding that certain fees violate the FDCPA where they are not supported by the language of the consumer agreement underlying the debt at issue); Fla. Stat. § 559.77(5) ("In applying and construing [the FCCPA], due consideration and *great weight*

shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the federal Fair Debt Collection Practices Act.") (emphasis added).

123.    Ms. Dawkins, like many borrowers, has an FHA mortgage, meaning that the mortgage is issued by an FHA-approved lender and insured by the FHA. The uniform covenants of the FHA mortgages state that the lender may only assess fees authorized by the Secretary of HUD.

124.    HUD permits servicers of FHA mortgages to collect "allowable fees and charges," i.e., fees and charges specifically delineated in Appendix 3 to the HUD Single Family Housing Policy Handbook. *See* Handbook 4000.1, FHA Single Family Housing Policy Handbook § III(A)(1)(f). Servicers seeking to assess fees "not specifically mentioned" in the Servicing Handbook must request approval from the National Servicing Center to charge such fees. *Id.* § III(A)(1)(f)(B). HUD prohibits servicers from charging the borrower for "activities that are normally considered a part of a prudent Mortgagee's servicing activity. *Id.* § III(A)(1)(f)(C)."

125.    The HUD Handbook does not authorize Pay-to-Pay Fees. Carrington has not sought authorization from the National Servicing Center to charge Pay-to-Pay Fees.

126.    Like other FHA mortgages, the Mortgage Agreement states that "Lender may collect fees and charges authorized by the Secretary." **Ex. A** ¶ 8.  By assessing Pay-to-Pay Fees not "authorized by the Secretary," Carrington violated the uniform covenants of the Mortgage Agreement.

127.    Because the above provisions are contained in the "Uniform Covenants" section of the Mortgage Agreement, Carrington has breached its contracts on a class-wide basis.

128.    Ms. Dawkins and the members of the Nationwide FHA Class and the Florida Class were damaged by Carrington's breaches.

**COUNT IV**
**UNJUST ENRICHMENT**
**On Behalf of Ms. Dawkins and the Florida Class and the Nationwide FHA Class**
**(pled in the alternative to breach of contract claims)**

129. Paragraphs 1 to 77 are hereby incorporated by reference.

130. Ms. Dawkins and the members of the Nationwide FHA Class and the Florida Class conferred benefits on Carrington. Namely, Ms. Dawkins and the Class Members paid Pay-to-Pay Fees to Carrington.

131. Carrington's retention of these benefits is unjust because Carrington had no right to collect the Pay-to-Pay Fees under the Uniform Mortgages or applicable law.

132. Ms. Dawkins and the members of the Nationwide FHA Class and the Florida Class are entitled to restitution and Carrington are required to disgorge the benefits it unjustly obtained.

**JURY DEMAND AND RESERVATION OF PUNITIVE DAMAGES**

133. Ms. Dawkins is entitled to and respectfully demands a trial by jury on all issues so triable.

134. Ms. Dawkins reserves the right to amend the Complaint and add a claim for punitive damages.

**RELIEF REQUESTED**

WHEREFORE. Ms. Dawkins for herself and on behalf of the Classes, respectfully request this Court to enter judgment against Carrington for all of the following:

a. That Ms. Dawkins and all Class Members be awarded actual damages, including but not limited to forgiveness of all amounts not owed;

b. That Ms. Dawkins and all Class Members be awarded statutory damages;

c. That Ms. Dawkins and all Class Members be awarded restitution;

d. That Ms. Dawkins and all Class Members be awarded costs and attorney's fees;

e. Carrington be enjoined from collecting Pay-to-Pay Fees that constitute any profit to it;

f. That the Court enter an order that Carrington and its agents, or anyone acting on its behalf, are immediately restrained from altering, deleting or destroying any documents or records that could be used to identify class members;

g. That the Court certify Ms. Dawkins' claims and all other persons similarly situated as class action claims under Fed. R. Civ. P. 23(b)(3); and

h. Such other and further relief as the Court may deem just and proper.

Dated: May 20, 2020

Respectfully submitted,

/s/ *James L. Kauffman*
James L. Kauffman (Fla. Bar. No. 12915)
BAILEY & GLASSER LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
Tel.: (202) 463-2101
Fax: (202) 463-2103
Email: jkauffman@baileyglasser.com

Hassan A. Zavareei (*pro hac vice* application to be filed)
Kristen G. Simplicio (*pro hac vice* application to be filed)
Katherine M. Aizpuru (*pro hac vice* application to be filed)
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950

Email: hzavareei@tzlegal.com
Email: ksimplicio@tzlegal.com
Email: kaizpuru@tzlegal.com

Victor S. Woods (*pro hac vice* application to be filed)
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Tel.: 304-345-6555
Fax: 304-342-1110
Email: vwoods@baileyglasser.com

*Counsel for Plaintiff*

# EXHIBIT A

2

After Recording Return To:
United Lender Services
2000 Cliff Mine Rd, Suite 610
Pittsburgh, PA 15275
This document prepared by:
**ADREANNA HOWELL**
**NEW PENN FINANCIAL, LLC**
**4000 CHEMICAL ROAD**
**PLYMOUTH MEETING, PA 19462**
**(888) 673-5521**

[Space Above This Line For Recording Data]

# MORTGAGE

253861

**DAWKINS**
Loan #: [redacted]0289
MIN: 1[redacted]02890
PIN: 48-41-25-10-0280
Case #: 095-1724021-703

THIS MORTGAGE ("Security Instrument") is given on **JUNE 24, 2010**. The mortgagor is **SEMION C DAWKINS AND VICTORIA DAWKINS, HUSBAND AND WIFE** ("Borrower"). This Security Instrument is given to Mortgage Electronic Registration Systems, Inc. ("MERS") (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns), as mortgagee. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of PO Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. **NEW PENN FINANCIAL, LLC** ("Lender") is organized and existing under the laws of **DE**, and has an address of **6250 OLD DOBBIN LANE SUITE 110, COLUMBIA, MD 21045**. Borrower owes Lender the principal sum of **ONE HUNDRED THIRTY FIVE THOUSAND NINE HUNDRED FORTY NINE AND 00/100** Dollars (U.S. **$135,949.00**). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on **JULY 1, 2040**. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in **BROWARD** County, Florida:
**SEE ATTACHED LEGAL DESCRIPTION**
which has the address of [redacted], **MARGATE**, Florida **33063** ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

(9)



BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage,grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest and Late Charge**. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

**2. Monthly Payment of Taxes, Insurance, and Other Charges**. Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under Paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 et seq. and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

**3. Application of Payments**. All payments under Paragraphs 1 and 2 shall be applied by Lender as follows:

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

0289

**4. Fire, Flood and Other Hazard Insurance**. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either(a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in Paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in Paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**5. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provision of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**6. Condemnation**. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in Paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in Paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**7. Charges to Borrower and Protection of Lender's Rights in the Property**. Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower

shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

**(a) Default.** Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

**(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including section 341(d) of the Garn-St Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent) and

(ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

**(e) Mortgage Not Insured.** Borrower agrees that should this Security Instrument and the Note are not to be eligible for insurance under the National Housing Act within **60 days** from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated

subsequent to **60 days** from the date hereof, declining to insure this Security Instrument and the Note shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. Reinstatement**. Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorney's fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver**. Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers**. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Notices**. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to

do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16 "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

Upon default as provided in Paragraph 9(a), and upon written demand by Lender to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**18. Foreclosure Procedure:** If Lender requires immediate payment in full under paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.

**19. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordations costs.

**20. Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall

[REDACTED]0289

include any attorneys' fees awarded by an appellate court.

**21. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

The Following Rider(s) are to be executed by Borrower and are attached hereto and made a part thereof [check box as applicable]:

☐ Condominium Rider ☐ Growing Equity Rider ☐ Adjustable Rate Rider
☐ Planned Unit Development Rider ☐ Graduated Payment Rider
☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

6/24/10
- BORROWER - SEMION C DAWKINS - DATE -

6/24/10
- BORROWER - VICTORIA DAWKINS - DATE -

Borrower's Mailing Address: [REDACTED] [REDACTED] MARGATE, FL 33063

Signed, sealed, and delivered in the presence of:

MARIA LUMINOSO VINCENT J. LUMINOSO

[redacted]0289

STATE OF Florida

COUNTY OF Broward

The foregoing instrument was acknowledged before me this 24 day of June 2010, by

Semion C Dawkins
Victoria Dawkins

Who is personally known to me or has produced Fl Drivers license as identification.

Notary Public MARIA LUMINOSO

My Commission Expires: 25th Oct 2013
Serial #:

SD
VD



Exhibit A

LEGAL DESCRIPTION:

LAND REFERRED TO IN THIS COMMITMENT IS DESCRIBED AS ALL THAT CERTAIN PROPERTY SITUATED IN THE COUNTY OF BROWARD, AND STATE OF FLORIDA AND BEING DESCRIBED IN A DEED DATED 03/25/2008 AND RECORDED 04/29/2008 IN BOOK 45321 PAGE 987 AMONG THE LAND RECORDS OF THE COUNTY AND STATE SET FORTH ABOVE, AND REFERENCED AS FOLLOWS:

THE FOLLOWING DESCRIBED LAND, SITUATE, LYING AND BEING IN BROWARD COUNTY, FLORIDA, TO-WIT:

LOT 16, BLOCK 2, OF IBEC ADDITION NO. 8, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 48, PAGE 14, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

PARCEL IDENTIFICATION NUMBER: 48-41-25-10-0280

PARCEL NO. 48-41-25-10-0280